UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CIVIL ACTION NO. 5:11-CV-128-KSF

DUBLIN EYE ASSOCIATES, P.C., et al.                                           PLAINTIFFS

vs.                             **OPINION AND ORDER**

MASSACHUSETTS MUTUAL LIFE
INSURANCE COMPANY, et al.                                                     DEFENDANTS

\* \* \* \* \* \* \* \*

This matter is before the Court on Defendants' motion for summary judgment on the ground that Plaintiffs' claims are barred by the statute of limitations. While Plaintiffs might have had some legitimate claims if they had been timely raised, the delay in bringing their claims is fatal. For the reasons discussed below, the motion will be granted.

I.   BACKGROUND

Dublin Eye Associates, P. C. ("DEA") established a pension plan ("Plan") for its principals and employees in 1980. The original Plan Trustees were DEA's doctors, Roger D. Smith ("Smith") and James Y. Jones ("Jones").[1] Defendants Catherine Chatfield ("Chatfield"), Qualified Plan Services, Inc. ("QPS"), and Kim Shea ("Shea") acted as the Plan's third-party administrator or assisted with such administration at varying times from 1981 to 1999.

Plaintiffs contend they relied heavily on Defendant Tom Ackerman, originally an employee of Massachusetts Mutual Life Insurance Company ("Mass Mutual") and a cousin and very close friend of Plaintiff Dr. Smith, in establishing and maintaining the Plan. Plaintiffs claim that Ackerman determined all Plan investments until the Plan changed in 1998, when its investments become

---

[1] DEA's doctors Randall Ozment ("Ozment") and Glendon Smalley ("Smalley") later took over as Trustees, but Smith and Jones were the primary Trustees during the period relevant to this litigation.

participant directed.  Around that time, Ackerman left Mass Mutual and became associated with Mark Query at LPL Financial.  Ackerman and Query continued to provide products and services to the Plan until 2006, when Ackerman parted ways with DEA.  Plaintiffs argue it was not until 2007 that they discovered the Plan was comprised of multiple whole-life insurance policies and annuities for each participant.  They say they were told that each participant would have only one or two insurance policies. Plaintiffs argue the Defendants breached fiduciary duties under ERISA by using Plan funds for multiple unauthorized policies, which resulted in very high commissions for Ackerman and others, but little benefit to the participants.  Plaintiffs further allege that Trustees' signatures were forged on some policy applications and that Ackerman engaged in conduct to conceal the policies and avoid detection of the unauthorized investments.

Defendants deny the existence of a fiduciary relationship, much less any breach.  For purposes of their motion for summary judgment, however, they focus solely on the timing of the alleged fiduciary breaches and on information provided to Plaintiffs.  Defendants summarize the critical question as:  "When did Plaintiffs know, or when should they have known, about the policies acquired for the Plan between 1980 and 1998?"  DE 331 at 1.  Discussed as part of the analysis below are a series of documents and events which Defendants argue demonstrate plainly that Plaintiffs knew or should have known of the policies more than six years before filing their complaint in 2011. Accordingly, Defendants argue the claims are barred by the statute of limitations.

Plaintiffs' fifty-page Response argues many extraneous and irrelevant issues. For example, DEA says "Ackerman told them that it was a requirement to include life insurance as a Plan investment, and that in doing so the Plan's administrative fees would be reduced.  ... Ackerman's representations were false."  DE 306 at 4.  These allegations were first pled in DEA's Third Amended Complaint. DE 165-2 at ¶ 16.  Yet, DEA's motion to file the Third Amended Complaint was denied on February 8, 2013. DE 259.  Moreover, Plaintiffs were told in October of 2012 that

they "may not seek to prove fraudulent inducement in support of their claim of breach of fiduciary duty or any other claim." DE 156 at 2. Accordingly, the Court will not address these and other irrelevant arguments in the Response.

Plaintiffs' primary theme in this case is that they trusted Ackerman, did what he told them to do, and saw nothing. They also do not remember very much, except that Ackerman reassured them that all was well. They claim Ackerman misled them about the Plan investments and concealed information about the multiple policies from them. It is their position that each participant in the Plan was to have only one or two whole life policies, but Ackerman sold them many more without their knowledge or authorization. The specific factual situations on which the parties rely are discussed more fully below.

## II.     ANALYSIS

### A.     Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party shows that there is an absence of evidence to support the nonmoving party's case, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). Conclusory allegations are not

enough to allow a nonmoving party to withstand a motion for summary judgment. *Id.* at 343. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson,* 477 U.S. at 252. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

### B.     ERISA Statute of Limitations and Discovery

The ERISA statute of limitations for a breach of fiduciary duty provides:

> No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of –
>
> (1)     six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or
>
> (2)     three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
>
> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113. In summary, the limitation period is six years from the last act or date to cure, unless there is earlier actual knowledge, which shortens the time to three years. If there is fraud or concealment, however, the six-year period does not begin until the date of discovery.

Defendants argue that Plaintiffs had actual knowledge more than three years before their complaint was filed and, thus, the claims are barred. Plaintiffs argue there was fraud or concealment involved, and they did not discover the violations until 2007. Accordingly, Plaintiffs contend that their complaint filed in 2011 was within six years from discovery and was timely.

"Actual knowledge" under § 1113(2) is "knowledge of the facts or transaction that constituted the alleged violation; it is not necessary that the plaintiff also have actual knowledge that the facts establish a cognizable legal claim under ERISA in order to trigger the running of the statute." *Wright v. Heyne*, 349 F.3d 321, 330 (6th Cir. 2003). This definition is consistent with prior

decisions of the Sixth Circuit and "also furthers the policies underlying statutes of limitations. Among the basic policies served by statutes of limitations is preventing plaintiffs from sleeping on their rights and prohibiting the prosecution of stale claims." *Id.*

"Actual knowledge does not 'require proof that the individual Plaintiffs actually saw or read the documents that disclosed' the allegedly harmful investments." *Brown v. Owens Corning Investment Review Committee*, 622 F.3d 564, 571 (6th Cir. 2010). "Congress did not intend 'the actual knowledge requirement to excuse willful blindness by a plaintiff.'" *Id.*, quoting *Edes v. Verizon Communications, Inc.*, 417 F.3d 133, 142 (1st. Cir. 2005). "[B]ecause Plaintiffs' actual knowledge runs from the date that documents were provided, or made available, to Plan Participants disclosing the facts underlying the alleged breach of fiduciary duty, Plaintiffs cannot avoid the bar of ERISA's three year statute of limitations by merely claiming that they did not read the documents that form the basis for their claims." *Id.*, quoting *Shirk v. Fifth Third Bancorp*, No. 05-cv-049, 2009 WL 3150303 at *3 (S.D. Ohio Sept. 30, 2009).

If no actual knowledge is established, the basic six-year statute of limitation dating from the last violation becomes applicable. Since the last policies were purchased in 1998, the claims would have been barred in 2004 under this standard.

If there was fraud or concealment, however, the six-year limitations period would not begin to run until the breach is discovered or should have been discovered. Courts are split on whether the fraud exception requires merely an underlying breach sounding in fraud or whether the conduct must constitute fraudulent concealment. *Cataldo v. U.S. Steel Corp.*, 676 F3d 542, 549-50 (6th Cir. 2012). The Sixth Circuit declined to decide this issue. *Id.* at 551. For purposes of this Opinion, and despite persuasive analysis to the contrary, this Court will assume the Sixth Circuit would adopt the interpretation in *Cataldo* "that a claim of fiduciary fraud not involving separate acts of concealment is subject to a six-year limitations period that begins to run when the plaintiff discovered or with due diligence should have discovered the fraud." *Id.* The Court further

5

assumes, for purposes of summary judgment analysis, that Plaintiffs introduced sufficient evidence of fraud that the exception would apply. Even under this lenient standard, however, Plaintiffs' claims are barred by limitations.

The term "discovery," when used in a statute of limitations, can be broader than "actual discovery." *See, e.g., J. Geils Band Employee Beneficiary Plan v. Smith Barney Shearson*, 76 F.3d 1245, 1254 (1st Cir. 1996) (holding that "discovery," as used in a statute of limitations within the Employee Retirement Income Security Act, "encompasses both actual and constructive discovery"), *cert denied*, 519 U.S. 823; *New England Health Care Employees Pension Fund v. Ernst & Young,* 336 F.3d 495, 499 (6th Cir. 2003) ("If actual discovery were required, investors could extend the time for filing suit simply by refusing to investigate possible fraud."), modified on other grounds in *Merck & Co., Inc. v. Reynolds*, 599 U.S. 633, 130 S. Ct. 1784, 1798 (2010). *See also Hughes v. Vanderbilt University*, 215 F.3d 543, 548 (6th Cir. 2000) (rejecting a claim of no knowledge because media reports had not been heard or read and holding that the "relevant inquiry in cases such as the one before us, however, is an objective one," citing *J Geils Band*).

In determining when a plaintiff should have discovered any fraud or breach of fiduciary duty, the question becomes whether the plaintiff exercised reasonable due diligence in uncovering the fraud. *J Geils Band*, 76 F.3d at 1254. The Sixth Circuit "follows the 'discovery rule,' which provides that 'the statute of limitations begins to run when the plaintiff knows or has reason to know of the injury which is the basis of his action and that a plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence.'" *Dixon v. Clem*, 492 F.3d 665, 671 (6th Cir. 2007). *See also Brown v. Owens Corning Investment Review Committee*, 622 F.3d 564, 573 (6th Cir. 2010) (Plaintiffs must show they were not on actual or constructive notice of wrongdoing "despite their exercise of diligence.").

> Unsophisticated or not, plaintiffs cannot shroud themselves in ignorance or expect that their unsophistication will thoroughly excuse their lack of diligence or failure ... to even inquire. To allow unsophisticated investors to remain utterly ignorant in the face of multiple warnings would render meaningless the due diligence requirement.

> Requiring due diligence encourages plaintiffs to take action to bring the alleged fraud to light, grants some sense of repose to defendants, and assures that evidence presented on the claim will be fresh.

*J Geils Band*, 76 F.3d at 1260.

The focus in Defendants' motion for summary judgment is a series of documents that they claim show actual knowledge or at least sufficient information that the Plaintiffs failed to exercise reasonable diligence and should have known there were multiple policies more than six years before they filed their complaint in 2011.

### C. Detailed Invoices

Defendants note that Mass Mutual sent DEA annual invoices, which list separately by participant each of the life insurance policies purchased by the Plan. DE 265-1 at 32-33; DE 331 at 7-10; DE 331-5 (invoices). Beginning in 2001, the invoices show the contract type "Life" next to each contract number. DE 331-5 at 31. The October 2001 invoice lists J Y Jones on the third page with seven policies and Anita Mallory with ten policies. *Id.*

Anita Mallory was DEA's Office Manager from 1986 forward and admitted receiving the annual invoices. DE 265-20, Mallory Depo. at 34-42, 68-79. In fact, she was given any mail addressed generally to DEA or the Plan. *Id.* at 30. She opened the mail and decided what to do with it. *Id.* at 31, 51; Smalley Depo. 219-220, 226. If it was an invoice, such as the annual invoices for premiums from Mass Mutual, her practice was to remove the payment coupon from the rest of the invoice and provide the coupon to one of the doctors along with a prepared check to sign in order to authorize payment for premiums. Mallory Depo. at 51, 68-79. She did not give the doctor the list of policies with the check, but she kept the entire invoices with their policy lists in her office for seven years. *Id.* at 113. From 1986 until Dr. Smith retired in 1999, Mallory put anything dealing with the pension plan, including the invoice coupons and checks, on Smith's desk. *Id.* at 46-47. Thereafter, she primarily provided pension documents to Dr. Jones. *Id.* at 47. When Dr. Jones was out of the office, she gave documents to Dr. Ozment or Dr. Smalley. *Id.* at 48; Smalley

7

Depo. 231-32. Mallory testified that none of the doctors ever asked for the details about these invoices. Mallory Depo. at 77-78. However, if they wanted to know what they were paying for, all they had to do was ask for the invoice detail she kept in her office. *Id.* at 171. Mallory and the Plan Trustees admitted that handling Plan invoices and related materials was part of her job responsibilities as DEA's office manager and contact person. *Id.* at 24-33; Dr. Smith Depo. at 278; Dr. Jones Depo. at 189-90; Dr. Smalley Depo. at 84, 217-220, 226. Her responsibility for handling Plan documents and getting the bills paid were unquestionably material to her duties to DEA and the Plan. In 2010, Mallory gave invoices dated from 2002 to 2010 to Mark Query upon his request as he was assisting with investigation of the Plan. Mallory Depo. at 113.

Qualified Plan Services submitted detailed invoices in 1998 and thereafter, and the invoices were all paid by DEA. *Id.* at 94-96. Mallory also sent the end-of-year statements with the detailed listing of policies to DEA's accountant, Ernest Jones, for tax preparation purposes and to the third-party-administrator. *Id.* at 382-83. If anyone wanted to know how many policies a participant had, the information was also available through those sources. *Id.* at 389. The accountant's role with respect to the invoice was to advise Mallory whether the amount payable should be adjusted. *Id.* at 370, 383. Ernest Jones also received detailed cost-of-insurance reports with policy listings per participant, which he used for tax reporting. *Id.* at 268.

Query testified that, in 2007, he "uncovered something totally different than I was told would exist if anybody ever bothered to look. And for the first 26 years no one bothered to look." Query Depo. October 5, 2012 at 218. Having been told that each participant had one or two policies, he expected to find a total of 19 or 20 policies. *Id.* at 219, 389-90. Instead, he found that the Plan had fifty policies. *Id.* Query contacted Mass Mutual about the number of policies, and John Milbier was designated by Mass Mutual to meet with DEA and investigate the matter. Milbier Depo. at 211-213. On October 17, 2007, Milbier wrote a detailed letter explaining why he believed the various complaints were without merit. DE 306-36.

8

Dr. Smith was the Trustee of the Plan from its inception in 1980 through the time the last policy was sold in 1998. He testified that no one told him what a Trustee did, and he was not aware that he was also the Administrator of the Plan. Smith depo. at 54, 87-88. He was not aware that the Trustees were making investment decisions. *Id.* at 76. Smith wanted Mass Mutual to make whatever investments they thought prudent. *Id.* at 79. Ackerman gave Smith the original Plan documents, and they put most of them in a drawer in Smith's desk. *Id.* at 55, 63, 418-19. Later, Ackerman replaced some documents, but eventually threw most of the documents away, saying everything was on a computer now. *Id.* at 55-56. Smith knew the files were in his desk drawer, but he never opened the drawer. He is sure he looked at documents at some point, but he claims they were very technical. *Id.* at 57.

Ackerman went over account statements with Smith initially, but the statements were too confusing to Smith, and he was too busy. *Id.* at 64. It never occurred to Smith to have someone else in DEA help him. *Id.* According to Smith, Dr. Jones also never asked to read the Plan documents in Smith's drawer. *Id.* at 441-43. Dr. Jones admitted he could have asked Mallory for the details with the invoice, but he chose not to. Dr. Jones Depo. at 197. Smith never discussed the Plan or the policy detail with Ernest Jones, DEA's accountant. Dr. Smith Depo. at 170. Smith admitted he had an opportunity to read documents Ackerman brought to him or documents he was to sign, but he chose not to do so. Smith admitted if he had looked at a document in 1997, he "would have seen what it is [he is] now complaining about." *Id.* at 284. Smith also agreed he was an ignorant Trustee and Administrator. *Id.* at 530.

Smith relied on Ackerman to explain any documents if Smith had questions. Smith knew that the insurance policies were bought by the Plan and that he or Dr. Jones had to sign to authorize the purchase. *Id.* at 165. On numerous occasions, Smith filled out blank forms for Ackerman and was told that the rest of the form would be filled out later. *Id.* 198-200. Smith said

he was probably told it was an insurance application. *Id.* at 199. Whenever Ackerman told Smith to sign something, Smith signed it. *Id.* at 31, 201.

Plaintiffs are imputed with the knowledge of Ms. Mallory, who was acting as their agent. "The general rule of agency law states that a principal is charged with notice of facts that an agent knows or has reason to know." *BancInsure, Inc. v. U.K. Bancorporation, Inc.*, 830 F. Supp.2d 294, 301-2 (E. D. Ky. 2011). *See also Anderson v. General American Life Ins. Co.*, 141 F.2d 898, 908 (6th Cir. 1944) ("As a general rule, the principal is held to know all that his agent knows in any transaction in which the agent acts for him."). Mallory produced from her files invoices dating back to 2002. She admitted receiving invoices and making payments annually. Mallory Depo. at 68-88. Accordingly, Plaintiffs had constructive knowledge of the invoices and the information they contained at least nine years before this lawsuit was filed.

Plaintiffs argue that Mallory was only a high-school graduate and merely a "ministerial" employee whose knowledge should not be attributed to them. DE 306 at 42. A ministerial employee performs as directed, rather than exercising any discretion. A ministerial act is "one that requires only obedience to the orders of others, or when the …duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Jenkins Independent Schools v. Doe*, 379 S.W.3d 808, 812 (Ky. Ct. App. 2012). Plaintiffs have not presented any evidence from the record that Mallory was directed by the Trustees to take specific action with Plan correspondence and documents. To the contrary, Dr. Smalley agreed that DEA "entrusted Ms. Mallory with decision-making when it came to receiving documents and materials." Smalley Depo. at 219-220, 226. He characterized her as "an intelligent person," "sharp" and "on top of things." *Id.* at 254-55. Dr. Jones agreed that she was not given any directions. Dr. Jones Depo. at 190-91. The only direction Mallory was given was to file documents back away after checks were signed. Mallory Depo. at 45. Dr. Smith was aware that Mallory gave him only a payment coupon from an invoice and a check prepared for his signature. Smith Depo. at 620.

These were not insignificant checks. There is testimony regarding one invoice in 1994 for approximately $45,000 and another in 1997 for $90,500. Mallory Depo. at 78, 95.[2] Yet, Dr. Smith never asked Mallory for information regarding the payments DEA was making. *Id.* at 78; Smith Depo. at 289. Smith claims there "might have been a time" when he called Ackerman to see if the amount sounded right, but he did not question it further. Smith Depo. at 621.

Richard Butler, an employee of Qualified Plan Services ("QPS"), which was a third-party administrator for the Plan, said Mallory was his day-to-day contact with the Plan and his source of information for Plan data that he needed to prepare annual reports or answering any questions. Butler Depo. at 50, DE 350-2. Butler understood that Mallory's duties under the Plan included receiving reports, lists of policies, cost of insurance, invoices and other documents. *Id.* at 221-222.

Plaintiffs argue that Mallory or others could not tell from the invoices whether the products listed were insurance policies or annuities. DE 306 at 42. The Court will presume that is true. However, the 1994 invoice plainly has a column headed "Policy Number" and then shows **ten** policy numbers for Anita Mallory. There are also ten "Net Premium" amounts. DE 331-5 at 2. It does not require rocket science to figure out that ten policies from Mass Mutual are more than one or two, regardless of what kind of policies they were. Similarly, Anita Mallory's husband has six policy numbers listed by his name; Dr. Jones has seven. *Id.* Almost every person has more than one or two. *Id.* at 2-4. The 1996 invoice has a similar multiple-policy list, as do other invoices. DE 331-5.

Plaintiffs argue that Mallory would not have known the policies were "unauthorized" and that it would have been beyond her duties to evaluate the purchases or "make any decision as to whether the purchases were proper or authorized." DE 306 at 42. Mallory only needed to have an opportunity to know there were multiple policies to trigger the statute of limitations. "[I]t is not

---

[2] See also, for example, DE 131-5 invoices – 1994 $45,155; 1996 $43,133; 1999 $38,948; 2000 $37,216.

11

necessary that the plaintiff also have actual knowledge that the facts establish a cognizable legal claim under ERISA in order to trigger the running of the statute." *Wright v. Heyne*, 349 F.3d 321, 330 (6th Cir. 2003). *See also Brown v. Owens Corning Investment Review Committee*, 622 F.3d 564, 570 (6th Cir. 2010) (The Sixth Circuit specifically rejected an interpretation that actual knowledge "requires a showing that plaintiffs actually knew not only of the events that occurred which constitute the breach or violation but also that those events supported a claim for breach of fiduciary duty or violation under ERISA.").

Moreover, "[a]ctual knowledge does not 'require proof that the individual Plaintiffs actually saw or read the documents that disclosed' the allegedly harmful investments." *Brown*, 622 F.3d at 571. Rather, "actual knowledge runs from the date that documents were provided, or made available, to Plan Participants disclosing the facts underlying the alleged breach of fiduciary duty. Plaintiffs cannot avoid the bar of ERISA's three year statute of limitations by merely claiming that they did not read the documents that form the basis for their claims." *Id.*

Similarly, Plaintiffs cannot avoid the statute of limitations bar by sticking their heads in the sand and ignoring the regular notices that Mass Mutual sent them. As Query testified, any of the Trustees could have uncovered the multiple policies "if anybody ever bothered to look. And for the first 26 years no one bothered to look." Query Depo., October 5, 2012 at 218. Trustee Smalley acknowledged that Anita Mallory was fully capable of seeing on the second page of the invoice that she had ten policies and comprehending it. Smalley Depo. at 255-56. He agreed it was a little strange that Mallory was surprised or upset when she was advised in 2007 that she had ten policies. *Id.* at 258.

Additionally, DEA's accountant received invoices and would review them to determine if any adjustments should be made to the amount payable based on changes in personnel or the like. DE 265-21; Mallory Depo. at 65-89. Mallory also received cost-of-insurance reports and sent them to the accountant to prepare the Plan's taxes and to prepare an IRS Form 1099-R for each Plan

12

participant. These reports included a list of multiple policies for each participant and the cost of insurance for each policy. Mallory Depo. at 133-34; Ingrando Depo. at 12, 16-18, 50, 52, 65; DE 331-10. These documents were received as part of the accountant's duties for DEA as its agent, and their receipt alone was sufficient to give Plaintiffs notice of the multiple policies.

In opposition to a statute of limitations bar, Plaintiffs rely heavily on an unpublished opinion from the Third Circuit, *Chaaban v. Criscito*, 468 F. App'x 156 (3d Cir. 2012), calling it "eerily similar" factually to the present case. DE 306 at 38. This Court disagrees. In *Chaaban*, a sole trustee, Criscito, maintained two types of accounts for the participants, a comingled account in which each participant owned a proportional share, and separate individual accounts in which the participant owned the entirety. Criscito sold the stock in the comingled account for nearly $13 million, but only reported an account balance of $4 million, which was then allocated to the individual accounts. Criscito would not permit the third-party administrator to speak with anyone but him and directed that all information regarding the plan be sent to his home. He also would not provide year-end statements to the participants and only reported verbally or through documents he created. When one plan participant sought information regarding his balance in the combined account, he was assured that "Uncle Mario is taking care of you," and was given his balance on a napkin. *Id.* at 159. Criscito gave the accountant the inaccurate account balance and then signed an inaccurate Form 5500. Until Criscito was removed as Trustee in 2007, no one discovered his fraudulent conduct.

In the present case, by contrast, the Trustees had access to all the information they needed to determine what their investments were. All they had to do was look in Mallory's file, or in Smith's drawer, or talk to their accountant. Ackerman was not a Trustee, much less the only one, nor was he the only one with information like Criscito was. Ackerman may have assured the Trustees that everything was okay, like Criscito did, but he did not hide all information from them. Instead, Mass Mutual sent DEA ample detailed information regarding the Plan. Dr. Jones admitted finding some Plan documents shortly before his September 2012 deposition that had been in his desk drawer

since 1995. Dr. Jones Depo. at 335-341. He explained that his "desk drawer is fairly disorganized, unlike Roger's, so it's easy for things to get lost in there." *Id.* at 338. According to Plaintiffs' own investigator and adviser, Query, the information was readily available; all the Trustees had to do was look.

"In the context of fraud, we have imposed upon the plaintiff a positive duty to use diligence in discovering the existence of a cause of action. We have also held that information sufficient to alert a reasonable person to the possibility of wrongdoing gives rise to a party's *duty to inquire* into the matter with due diligence." *Medical Mutual of Ohio v. k. Amalia Enterprises, Inc.*, 548 F.3d 383, 391 (6th Cir. 2008) (emphasis in original; internal quotations and citations omitted). *See also McGuire v. Metropolitan Life Ins. Co.*, 899 F. Supp.2d 645, 662 (E.D. Mich 2012) (ERISA case holding that Plaintiff had duty to inquire once it was told that future dividends were unlikely).

Trustees of ERISA plans are obligated to "exercise a prudent standard of care when administering a plan." *Brown v. Owens Corning Investment Rev.*, 622 F.3d 564, 568 (6th Cir. 2010); 29 U.S.C. § 1104. In the present case, the Trustees were authorizing purchases from Mass Mutual for the participants and paying premiums for the Plan investments. While Dr. Smith disputes his signature on a number of policy applications, he does not dispute it on many others. Each time he signed a policy application, he had a duty to inquire what it was for and should not have signed blank application forms. Each time Mallory gave Dr. Smith or Dr. Jones a coupon for payment of premiums for Plan investments, the Trustees were on notice that the Plan had made purchases and that premiums were due for those purchases. If, as the Trustees claim, Ackerman for twenty-seven years was evading their questions about Plan assets, not providing policies or other documents, and just giving general assurances that everything is fine, those are sufficient storm warnings of possible wrongdoing[3] to trigger a duty to inquire. As the *J. Geils Band* court noted, "an investor must apply his common sense to the facts that are given to him ... in

---

[3] Additional storm warnings arose from the surrenders of policies, discussed below.

14

determining whether further investigation is needed." *J. Geils Band*, 76 F.3d at 1259. Instead of making minimal inquiry, Plaintiffs did absolutely nothing. Their conduct, in signing whatever Ackerman asked them to sign even if it was blank and in accepting whatever he represented the documents or facts were, was what allowed the situation to continue for so long.

This type of willful blindness was condemned in *J. Geils Band* as follows:

> [E]ven unsophisticated investors, such as Appellants here, should have sought to learn more about the nature and content of the Plan's management. We believe that Appellants' prolonged failure to investigate the possibility of fraudulent conduct in light of the multiple storm warnings can hardly be characterized as reasonable diligence. Unsophisticated or not, plaintiffs cannot shroud themselves in ignorance or expect that their unsophistication will thoroughly excuse their lack of diligence or failure, here, to even inquire. To allow unsophisticated investors to remain utterly ignorant in the face of multiple warnings would render meaningless the due diligence requirement. Requiring due diligence encourages plaintiffs to take action to bring the alleged fraud to light, grants some sense of repose to defendants, and assures that evidence presented on the claim will be fresh.

*J. Geils Band*, 76 F.3d at 1260. Unfortunately, no action was taken here and the evidence is very stale.

Plaintiffs also rely on *Meyer v. Berkshire Life Ins. Co.*, 250 F. Supp.2d 544 (D. Md. 2003). *Meyer* definitely has many similar facts. In *Meyer*, two neurosurgeons established a pension plan in 1980. They ultimately chose Meszaros, an agent of Berkshire, to manage and invest the pension plan funds from 1983 to 1997. *Id.* at 548-9. "The doctors trusted Meszaros and deferred entirely to his decisions." *Id.* at 549. The doctors signed investment documents delivered by Meszaros without questioning what they were and often signed blank forms. They also instructed their secretaries to prepare checks payable to Berkshire at Meszaros' request. *Id.* One doctor found a document on which his signature was forged. In annual meetings, the doctors were shown only the plans' bottom lines in comparison to the prior year and "there was virtually no discussion of individual transactions or investment strategies." *Id.* at 150. Berkshire required between 25 and 49.9 percent of the contributions to be put into life insurance policies and, in exchange, Berkshire did not charge an administrative fee for its services. *Id.* Contributions were invested

overwhelmingly in annuities. *Id.* at 554. The nature of the investments, the lack of diversification, and substantial churning by Meszaros was discovered after a secretary sought to borrow money from the plan in 1996 and learned that Meszaros was no longer employed by Berkshire, Berkshire would no longer service the plan, and tax returns had not been filed. *Id.* at 557. The doctors' lawsuit was filed in April 1999, within three years of the date of discovery. *Id* at 568.

Under *Meyer*, however, Plaintiffs' claims would still be barred. That court held that "the fraud and concealment exception to the statute of limitations did not apply" because the plaintiffs failed to exercise reasonable diligence in monitoring the fiduciary's conduct. *Id.* at 568, n. 32. There was no evidence in *Meyer* of actual knowledge prior to the discovery date. *Id.* at 569. Accordingly, the six-year statute applied and ran from the date of the breach or violation. The court held that there could be no recovery for breaches that occurred more than six years before the filing of the lawsuit. Only breaches within the six years before the lawsuit were eligible for recovery. *Id.* In the present case, the last policy was sold or breach occurred in 1998, far more than six years before this suit was filed in 2011. There are no claims that survive the limitations bar.

### D. Surrender of policies

Dr. Smith surrendered all of his whole life policies and annuities when he retired in 1999. Smith Depo. at 44, 254-256. Smith admitted that, as far as he knows, all of his policies were knowingly acquired. *Id.* at 223-24, 256. There were a total of nine whole life policies and three annuities when Smith surrendered them. *Id.* at 256. Smith admits that he and Dr. Jones signed each of the twelve surrender requests and that they both knew about his multiple policies in 1999. *Id.* at 258-59. Smith testified that he did not question Ackerman about the multiple policies because Smith had authorized all of his policies and had no reason to suspect at the time that anyone else had multiple policies. *Id.* at 257 -59.

When Query raised the issue of multiple policies with Dr. Smith in 2007, Query was told that Smith learned in 1999, when he retired and surrendered his policies, that Smith had nine insurance policies and a couple of fixed annuities.  Query Depo. at 390-94.  According to Query, Smith did not do anything about this discovery because he did not want to confront Ackerman, and it did not occur to him that other participants might have multiple policies.  *Id.* at 395-97.

Despite Dr. Smith's claim that he did not know in 1999 that any other participants had more than one or two policies, the record reflects that Cindy Thomas resigned and surrendered three whole life policies and one annuity in 1996.  Smith Depo. at 262-64.  Dr. Smith wrote a letter asking that the four policies be transferred and received a letter from Mass Mutual regarding Thomas' four policies.  *Id.* at 264-66.

Additionally, Ms. Mallory testified that she had records in her files from 1997 when Becky Soles and Sheila Soles left DEA's employment and surrendered their Plan policies for cash.  The first page of the form for Becky Soles lists seven policies.  Mallory testified she took this document to Dr. Smith, who signed it.  Mallory Depo. 296-98.  There was a similar policy surrender request for Sheila Soles reflecting that she had three policies.  Dr. Smith also signed this request.  *Id.* at 299-301.  Thus, despite Dr. Smith's protestations to the contrary, the record shows he had actual knowledge in 1999 that he had twelve policies; Becky Soles had seven policies; Cindy Thomas had four policies; and Sheila Soles had three policies.  The fact that Dr. Smith did not want to confront Ackerman is no excuse for ignoring these repeated storm warnings and failing to exercise reasonable diligence.

Dr. Jones denied knowing anything about more than one or two policies per plan participant until 2007.  Dr. Jones Depo. at 376.  In his deposition, however, he admitted that he signed Dr. Smith's surrender forms for nine separate life insurance policies in 1999.  He admitted the signature was his.  He also admitted he could have looked at the forms to see what he was signing, but he did not.  He simply signed what Smith or Ackerman asked him to sign.  *Id.* at 366-388.

17

### E.     Cost-of-Insurance Reports

Mallory admitted receiving cost-of-insurance reports from 1986 through at least 2007. She forwarded them to DEA's accountant. Mallory Depo. at 268. The cost-of-insurance reports list each policy and its cost by participant. DE 311-10. The accountant received these reports and used them in tax preparation. Mallory Depo. at 133; Ingrando Depo. at 12, 16-18, 50. Accordingly, the knowledge of the accountant, as an agent acting within the scope of his duty, should be imputed to Plaintiffs. *McGraw-Hill v. United States*, 623 F.2d 700, 704 (Ct. Cl. 1980).

### F.     Additional Documents

The record reflects that QPS provided DEA annual reports, which also contained a listing of all of the policies in the Plan. DE 331-11. Chapman of QPS testified that these reports were either mailed or given to Ackerman to hand deliver. Chapman Depo. at 89. Plaintiffs argue that Ackerman may not have provided these documents to Mallory because the Trustees do not recall seeing them. There is no evidence that these documents were withheld from DEA. Moreover, DEA paid the invoices for QPS's annual reports. DE 331-13.

Defendants also argue that Plaintiffs signed many applications for life insurance and that, from this alone, they should have known they had multiple insurance policies. Plaintiffs, however, have evidence that some of these signatures were forged. While there may be more than a sufficient number of unquestioned signatures to put Plaintiffs on inquiry notice of wrongdoing, there is also evidence that Plaintiffs were misled about the type of document they were signing. Accordingly, the Court is not considering the policy applications at this time with respect to the statute of limitations.

### G.     Insurance Code Claims

Count II of Plaintiffs' Second Amended Complaint alleges violations of the Kentucky Insurance Code. DE 67, ¶¶ 55-60. Defendants argue that the Kentucky Insurance Code is not applicable to the policies sold to Plaintiffs and, even if it were, the claims are untimely.

The scope of the Kentucky Insurance Code specifically excludes "policies or contracts not issued for delivery in this state nor delivered in this state." KRS 304.14-010(2). Plaintiffs argue there is no evidence that policies were delivered to DEA in Georgia. DE 306 at 48. To the contrary, Smith testified that Ackerman delivered all the original plan documents to DEA and put them in a drawer in Smith's desk. Smith Depo. at 62-63, 416-18. Smith also described Ackerman as bringing boxes of documents to DEA in Georgia and sometimes replacing documents in Smith's drawer. *Id.* at 434-38. Smith specifically testified that Ackerman brought policies to Georgia and had a "celebration" when he delivered a policy to an employee. *Id.* at 438-41.

Plaintiffs further argue that Ackerman received the policies in Kentucky before he delivered them to Georgia, and that fact should make the Kentucky Insurance Code applicable. DE 306 at 49. *Jefferson v. New York Life Ins. Co.*, 151 Ky. 609, 152 S.W. 780 (1913), sheds some light on this issue. There, the insured lived in Kentucky; he applied for the insurance in Kentucky; the policy was delivered to the insured in Kentucky; and all premiums were paid in Kentucky. *Id.* at 781. The court held it was a Kentucky contract, not a New York contract. While the agent was also a Kentucky resident, the opinion repeatedly references that it was the agent who was to "deliver" the policy, rather than be a recipient of a delivery. *See*: "instructions and directions ... were given to the local agent at the time the policy was forwarded to him for delivery"; "the policy issued and forwarded to the agent in Kentucky for delivery"; "[t]he policy was forwarded to the company's agent in Lexington for unconditional delivery to the insured"; "[a] policy must, under no circumstances, be delivered, unless the premium has been paid to the agent"; "the agent was to deliver the policy only under specified conditions, and not otherwise." *Id.* at 782. The location of the agent was of no consequence, and the "delivery" of the policy was to be made to the insured.

In the present case, the insured was located in Georgia. The policies were sent to Ackerman for delivery in Georgia and he delivered some policies in Georgia. The fact that some policies apparently were not delivered does not change the location where they were to have been

delivered by Ackerman. The Mass Mutual policies were issued for delivery in Georgia. Accordingly, the Kentucky Insurance Code does not apply to this case.

### III.  CONCLUSION

**IT IS ORDERED**:

A.  Defendants' motion for summary judgment [DE 265] is **GRANTED**.

B.  All other pending motions are **DENIED AS MOOT**.

C.  Judgment will be entered contemporaneously with this Opinion and Order.

D.  This case is **DISMISSED** and **STRICKEN** from the active docket.

This July 12, 2013.

Signed By:
_Karl S. Forester_ KSF
**United States Senior Judge**